**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**VARIOUS ARTICLES OF OBSCENE
MERCHANDISE, SCHEDULE NO.
1769, Defendants-Appellees.**

No. 685, Docket 78–6193.

United States Court of Appeals,
Second Circuit.

Argued Jan. 23, 1979.

Decided May 25, 1979.

Harvey J. Wolkoff, Asst. U. S. Atty., Southern District of New York (Robert B. Fiske, Jr., U. S. Atty., Peter C. Salerno, Asst. U. S. Atty., Southern District of New York, New York City, of counsel), for the United States of America.

Arthur N. Eisenberg, Steven Shapiro, New York Civil Liberties Union, New York City, for N.Y. Civil Liberties Union as amicus curiae.

Before LUMBARD, FEINBERG and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal by the United States from a judgment entered in the United States District Court for the Southern District of New York, Pierre N. Leval, *Judge*, after a bench trial, finding certain items seized by the United States Customs Service not legally "obscene" and ordering their release to their respective addressees. For the reasons that follow, we affirm in part and reverse in part and remand to the district court for further proceedings.

Between September 15 and September 21, 1978, the United States Customs Service seized 132 lots of allegedly obscene merchandise from the mail arriving in New York from overseas and five different allegedly obscene 8 mm. films from an arriving passenger at John F. Kennedy International Airport. The seized items were destined for the addresses of well over 100 citizens in twenty-five states and Wash-

ington, D. C. The seizure was made pursuant to § 305(a) of the Tariff Act of 1930, 19 U.S.C. § 1305(a). On September 26 a warrant for the arrest of the seized articles was issued by the Clerk of the District Court for the Southern District; the next day the United States Marshal made the arrest.[1]

On October 5, notice of this action was sent to each addressee. The notice read:

PLEASE TAKE NOTICE that the United States of America has commenced an action for the forfeiture and destruction of the below obscene material seized in New York, New York:

ADDRESSEE:      MERCHANDISE:

[          ]

[          ]

If you wish to contest the forfeiture and destruction of such merchandise, you have twenty (20) days from the receipt of this notice to file a Claim and Answer with this office. If you wish, you may sign and return the attached form to the undersigned as your Claim and Answer. Failure to file a Claim and Answer will result in the destruction of the merchandise addressed to you.

The form is signed by the United States Attorney and the Assistant United States Attorney assigned to the case.[2] The "Claim and Answer" form attached to the notice read:

I hereby file a Claim to the below described merchandise which was addressed to me and which has been seized by the plaintiff pursuant to 19 U.S.C. § 1305:

ADDRESSEE:      MERCHANDISE:

[          ]

[          ]

For my Answer to Complaint I deny that the merchandise seized is obscene and subject to forfeiture, but admit that the seized merchandise was sought to be imported into the United States through the Port of New York on the date set forth in Schedule "A" of the Complaint and that the merchandise was seized and is now in custody within the Southern District of New York. I demand judgment that the seized merchandise be forwarded to me.

Five persons signed and returned these forms; a sixth person claimed not by form but by letter.[3] Either just prior to, or at the same time as, the mailing of these forms, the government apparently also sent to the addressees something it calls an "as-

---

**1.** The procedure leading up to and following a seizure such as this one is thoroughly summarized in *United States v. 37 Photographs*, 402 U.S. 363, 365–66, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); *United States v. Various Articles of Obscene Merchandise, Schedule 1303*, 433 F.Supp. 1132, 1133–34 (S.D.N.Y.1976) and 562 F.2d 185, 185–86 (2d Cir. 1977) (reversing on other grounds), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978); *United States v. One Carton Positive Motion Picture Film Entitled "491"*, 247 F.Supp. 450, 454–55 (S.D.N.Y.1965) and 367 F.2d 889, 900–01 (2d Cir. 1966) (reversing on other grounds); and *United States v. One Book Entitled "The Adventures of Father Silas,"* 249 F.Supp. 911, 913–15 (S.D.N.Y.1966). *See also* J. Friedman, Regulation of Obscenity by Federal Agencies, V Technical Report of the Commission on Obscenity and Pornography 15, 24–34 (1970).

**2.** Notice was also published in The New York Law Journal on October 5, 1978, the item reading as follows:

United States District Court, Southern District of New York.—[At] the suit of the United States demanding forfeiture thereof under the provisions of 19 U.S.C. § 1305, I have arrested on Sept. 27, 1978, and hold Various Articles of Obscene Merchandise, Schedule No. 1769, filed under 78 Civ. 4526. Notice is hereby given that all persons claiming the same or knowing or having anything to say why the same should not be condemned and destroyed pursuant to the prayer of said complaint, must file their claims with the Clerk of this Court, in Room 14, United States Court House, Foley Square, New York, N.Y., within 10 days after the above-mentioned date of arrest or within such additional time as may be allowed by the Court, and must serve their answers within 20 days after the filing of their claims, or default and condemnation will be ordered. Dated: New York, N.Y., September 29, 1978. Robert B. Fiske, Jr., U.S. Attorney, SDNY. George V. Grant, U.S. Marshal, SDNY.

**3.** An apt suggestion was made by this claimant that the title of the government's action against these articles should be, "United States of America v. Various Articles of *Allegedly* Obscene Merchandise." (emphasis added).

sent to forfeiture" form.[4] At the trial below, the government attorney described this form as one that provides "an opportunity for the addressee to assent to an administrative forfeiture." The form read in relevant part as follows:

> Sir: Assent is hereby given to the forfeiture of [the seized articles] now in your custody [and] the subject of your notice dated above. This assent is neither an acknowledgement that the materials being forfeited were solicited nor an admission that it was known that they are obscene.

On November 6 and November 8, notice was sent to the six claimants informing them of the date and time of the proceedings in the district court for the determination of the obscenity of the claimed items.[5] This notice read in part:

> PLEASE TAKE FURTHER NOTICE that you may appear at the time and place of trial, in person or by an attorney, and contest on any appropriate grounds the right of the United States to seize and forfeit the materials you have claimed in this action. You need not

appear, either in person or by attorney, to have the issue of whether or not the goods you have claimed are obscene presented to the Court and you will be advised of the Court's decision when it is rendered.

Trial was held on November 20. The government introduced into evidence all of the seized articles as well as the various items of correspondence sent to or received from the addressees. None of the addressees appeared at trial. During the trial, the government moved for entry of a default judgment against the allegedly obscene articles that were addressed to persons who either had failed to file a Claim and Answer or had filed an "assent to forfeiture." The district court denied the motion, and determined whether each of the Schedule 1769 articles was or was not "obscene." On November 24 the court ordered destroyed those materials portraying children engaged in sexual activity as well as those materials portraying rape, sexual sadism, or other forms of violence. All other materials were ordered released and forwarded to their addressees. The government appealed.[6]

---

4. This "assent to forfeiture" is not provided for in the statute, but it is mentioned in 19 C.F.R. § 12.40, which provides in part:

> (b) Upon the seizure of articles or matter prohibited entry by section 305, Tariff Act of 1930 (with the exception of the matter described in paragraph (a) of this section), a notice of the seizure of such articles or matter shall be sent to the consignee or addressee.

> (c) When articles of the class covered by paragraph (b) of this section are of small value and no criminal intent is apparent, a blank assent to forfeiture, Customs Form 4607, shall be sent with the notice of seizure. Upon receipt of the assent to forfeiture duly executed, the articles shall be destroyed if not needed for official use and the case closed.

> . . . . .

> (g) In any case when a book is seized as being obscene and the importer declines to execute an assent to forfeiture on the ground that the book is a classic, or of recognized and established literary or scientific merit, a petition addressed to the Secretary of the Treasury with evidence to support the claim may be filed by the importer for release of the book. Mere unsupported statements or allegations will not be considered. If the

ruling is favorable, release of such book shall be made only to the ultimate consignee.

5. After receiving this notice, one of the claimants called the United States Attorney's Office to say that it had all been a mistake, that he had not intended to claim the material, and that he did not want the material forwarded to him.

6. On December 11, 1978, the district court granted a government motion for a partial stay of the judgment so the government could perfect its appeal to this Court. The stay was for sixty days, beginning November 24, and was conditioned on the government's filing with the Court of Appeals within one week a brief and record for appeal, an application for review of the stay, and an application for an expedited appeal. The court also ordered the government to send copies of the order granting a partial stay as well as "all pertinent papers" to the addressees of the articles ordered released. Subsequently, the government requested the district court to modify the stay so as to require briefing no earlier than February 1, 1979. The court gave the government until January 10, 1979, to file its brief, believing that such a schedule was "amply reasonable" given the important interests involved. On January 5, 1979, this Court, per Chief Judge Kaufman and

## DISCUSSION

### (I) *Default*

■ We consider first the question whether a default judgment may be entered against the materials addressed to persons who either had "assented" to their forfeiture or had chosen not to file a Claim and Answer.[7] The district court held that such a judgment could not be entered in proceedings of this kind. We agree and, accordingly, affirm the judgment of the district court in this regard.

The government's argument takes the following course. The procedure for actions commenced under § 1305(a) is governed by the Supplemental Rules for Certain Admiralty and Maritime Claims. Rule A of these rules provides that the Rules of Civil Procedure for the United States District Courts are applicable to the extent that they are not inconsistent with the Supplemental Rules. There is nothing in the Supplemental Rules regarding default, so Fed.R.Civ.P. 55 is properly consulted for guidance. Under this rule, the argument goes, the district court had the power to, and should have, entered a default judgment against the unclaimed articles. But this is to miss the forest for the trees. Given the important First Amendment interests at stake, we decline to approve of such a procedure. *Compare St. Martin's Press, Inc. v. Carey*, No. 77–7603 (2d Cir. 1979) (Timbers, J., dissenting) ("Particularly where First Amendment rights are involved,

courts must be sensitive to the first whisper of a chilling wind—the whisper picked up first by the beeches before the pines.").[8]

■ The statute provides in relevant part as follows:

All persons are prohibited from importing into the United States from any foreign country . . . any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material . . . or other article which is obscene or immoral . . . . No such articles whether imported separately or contained in packages with other goods entitled to entry, shall be admitted to entry; and all such articles and, unless it appears to the satisfaction of the appropriate customs officer that the obscene or other prohibited articles . . . were inclosed therein without the knowledge or consent of the importer . . ., the entire contents of the package . . . shall be subject to seizure and forfeiture . . . . [T]he Secretary of the Treasury may, in his discretion, admit the so-called classics or books of recognized and established literary or scientific merit, but may, in his discretion, admit such classics or books only when imported for noncommercial purposes.

Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the appropri-

---

Judge Smith, granted a government motion for a stay of the district court's order pending disposition of the government's appeal and expedited the hearing of oral argument. *Compare United States v. Reliable Sales Co.*, 376 F.2d 803 (4th Cir. 1967), *cited in United States v. 37 Photographs, supra*, 402 U.S. at 373, 91 S.Ct. 1400, *with United States v. One Carton Positive Motion Picture Film Entitled "491"*, 247 F.Supp. 450, 459 (S.D.N.Y.1965), *rev'd on other grounds*, 367 F.2d 889 (2d Cir. 1966), *cited in United States v. 37 Photographs, supra*, 402 U.S. at 372, 91 S.Ct. 1400.

After oral argument, we granted a motion by the New York Civil Liberties Union to submit a brief as *amicus curiae*. The government, in turn, was permitted to respond in letter form to the *amicus* brief.

7. Only one claimed article was found by the district court not to be "obscene" within the meaning of the statute. The addressees of the other articles found not to be "obscene" either failed to file a Claim and Answer or filed an "assent to forfeiture."

8. We note that Rule 55 governs default by a *"party* against whom a judgment for affirmative relief is sought." (emphasis added). It cannot be said that the named defendants in this action, the allegedly "obscene" articles, have "defaulted." Quite to the contrary, they appeared, with the government's assistance, at the trial before the district court and are before us now on appeal. The addressees, on the other hand, have not been named as parties to this action, and are at most, "parties in interest." 19 U.S.C. § 1305(a).

ate customs officer *to await the judgment of the district court* as hereinafter provided . . . . Upon the seizure of such book or matter such customs officer shall transmit information thereof to the district attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. *Upon the adjudication* that such book or matter thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed. *Upon adjudication* that such book or matter thus seized is not of the character the entry of which is by this section prohibited, it shall not be excluded from entry under the provisions of this section.

19 U.S.C. § 1305(a) (emphasis added). As is quite obvious, "forfeiture pursuant to § 305 would suppress the material entirely and condemn it in all contexts." *United States v. 35 MM. Motion Picture Entitled "Language of Love,"* 432 F.2d 705, 714 (2d Cir. 1970), *cert. dismissed,* 403 U.S. 925, 91 S.Ct. 2241, 29 L.Ed.2d 704 (1971). In our judgment, Congress intended this final restraint to be imposed only upon a judicial determination that seized articles are "obscene," and not as the result of an unchallenged administrative recommendation for destruction.

■ This conclusion is amply supported by the statute's legislative history. *See United States v. 37 Photographs,* 402 U.S. 363, 368–71, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); *United States v. One Book Entitled "The Adventures of Father Silas,"* 249 F.Supp. 911, 916–19 (S.D.N.Y.1966). We have held as much:

> The Collector of Customs is not authorized under any circumstances finally to determine whether material seized is obscene. His sole function is to select material for judicial review. The power to determine questions of obscenity is vested solely in the courts. In fact, the legisla-

tive history of Section 305 indicates great hostility, on the part of the Congressmen who devised the section, to administrative censorship and manifests their desire that the question of obscenity should "be quickly submitted to the district attorney and to the court for determination."

*United States v. One Carton Positive Motion Picture Film Entitled "491,"* 367 F.2d 889, 899 (2d Cir. 1966). *See also United States v. Various Articles of Obscene Merchandise, Schedule 896,* 363 F.Supp. 165, 166 (S.D.N.Y.1973); *United States v. A Motion Picture Film Entitled "I am Curious (Yellow),"* 285 F.Supp. 465, 467–68 (S.D.N.Y.), *rev'd on other grounds,* 404 F.2d 196 (2d Cir. 1968); *United States v. One Carton Positive Motion Picture Film Entitled "491,"* 248 F.Supp. 373, 376–77 (S.D.N.Y. 1965) and 247 F.Supp. 450, 457 (S.D.N.Y. 1965), *rev'd on other grounds,* 367 F.2d 889, *supra; United States v. Reliable Sales Co.,* 376 F.2d 803, 806 (4th Cir. 1967). *Compare United States v. Various Articles of Obscene Merchandise, Schedule 1303,* 433 F.Supp. 1132, 1134 (S.D.N.Y.1976), *rev'd on other grounds,* 562 F.2d 185 (2d Cir. 1977), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978); *United States v. Obscene Magazines,* 382 F.Supp. 975 (C.D.Cal. 1974). The effect of the government's suggested procedure here would be to remove from the judiciary the statutorily imposed obligation to rule on the obscenity of seized items. We cannot, in light of the clear wording of the statute, say that an addressee's decision to file an "assent to forfeiture" or not to file a "Claim and Answer" serves to lift the burden of making these "adjudications" from the shoulders of the federal courts.

■ Even if we found the statute ambiguous, however, we would decline to sanction the default procedure suggested by the government. The practical effect of such a procedure would be to permit the government's administrative seizure and subsequent destruction of books, magazines and films to become an unreviewed act of cen-

sorship.[9] As a result, citizens could be prevented from receiving materials which the courts, given the opportunity, would find not obscene. This we will not allow.

"We risk erosion of First Amendment liberties unless we train our vigilance upon the methods whereby obscenity is condemned no less than upon the standards whereby it is judged." *Manual Enterprises v. Day,* 370 U.S. 478, 497, 82 S.Ct. 1432, 1442, 8 L.Ed.2d 639 (1962) (Brennan, J., concurring). This is so because "constitutionally protected expression . . . is often separated from obscenity only by a dim and uncertain line." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 66, 83 S.Ct. 631, 637, 9 L.Ed.2d 584 (1963). Thus, the teaching of the Supreme Court's cases is that "only a procedure requiring a judicial determination suffices to impose a valid final restraint." *Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965). As explained further by the Court in *Blount v. Rizzi,* 400 U.S. 410, 417, 91 S.Ct. 423, 428, 27 L.Ed.2d 498 (1971):

> [T]o avoid constitutional infirmity a scheme of administrative censorship must: place the burdens of initiating judicial review and of proving that the material is unprotected expression on the censor; require "prompt judicial review" —a final judicial determination on the merits within a specified, brief period—to prevent the administrative decision of the censor from achieving an effect of finality; and limit to preservation of the status quo for the shortest, fixed period

compatible with sound judicial resolution, any restraint imposed in advance of the final judicial determination.

*See also Interstate Circuit, Inc. v. Dallas,* 390 U.S. 676, 682, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968); *Teitel Film Corp. v. Cusack,* 390 U.S. 139, 141, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968); *LaMont v. Postmaster General,* 381 U.S. 301, 307, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

Given these pronouncements by the Supreme Court, and given the important First Amendment interests involved, it is our judgment that the government's position on this issue is neither supported nor supportable. "The separation of legitimate from illegitimate speech calls for . . . sensitive tools . . . ." *Speiser v. Randall,* 357 U.S. 513, 525, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958). As unedifying as we may find this task in cases involving alleged "obscenity," it is the judiciary which must wield these implements, not administrators or executive officers, who make only the initial determination that certain materials are of doubtful legality.

Accordingly, we affirm the district court's decision in this regard.

(II) *"Obscenity"*

We turn now to the central issue before the district court: whether the seized articles were "obscene" for purposes of § 1305(a) and therefore subject to destruction. The court expressly, and correctly, referred to the definition laid out in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37

---

**9.** As explained by the district court:

> Addressees are unlikely to file claims on receiving notice that government officials have seized "obscene" materials. If the material is indeed obscene, statutes of the United States and of most of the states make its importation, transportation or acquisition a criminal offense. . . . The printed claim form which the government sends to addressees upon seizure requires the addressee to "admit that the seized merchandise was sought to be imported into the United States through the Port of New York". . . . A potential claimant might well believe, and reasonably so, that in signing such a form he was furnishing the government with evidence which could be used against him in a criminal prosecution. In contrast, the printed assent-to-forfeiture form which the Government sends to the addressee offers the comforting exculpatory statement that "this assent is neither an acknowledgement that the materials being forfeited were solicited nor an admission that it was known that they are obscene." . . . The filing of an assent form in the circumstances is no more consistent with the interpretation advocated by the government that the addressee didn't send for and doesn't want the material than that the addressee wants to stay out of trouble. (citations and footnote omitted). *See also United States v. One Book Entitled "The Adventures of Father Silas", supra,* 249 F.Supp. at 922.

L.Ed.2d 419 (1973), as governing this question. In *Miller,* the Court defined as obscene those "works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." 413 U.S. at 24, 93 S.Ct. at 2615. It is the district court's application of this definition to the articles here in question that we examine on this appeal.

The district court determined that all of the seized articles satisfied the first and third parts of the *Miller* test. As to the second part of the definition, however, that part having to do with the "patent offensiveness" of the portrayal of sexual conduct, the court "divided the materials into subject matter groups in accordance with [its] perception of differing community attitudes." The court found that photographs and films of children engaged in sexual activity "have provoked a very widespread public outrage, based in considerable part on revulsion at the potentially harmful exploitation of children for commercial sex purposes." The court held such materials "offensive to the community standards" and ordered them destroyed. The court made a similar finding and holding regarding the materials depicting rape, sexual sadism or other forms of violence. Those items were also ordered destroyed.

The court made quite a different finding, however, with regard to "*adult* materials . . . which do not involve violence, rape or sadism." (emphasis in original). The court characterized these items as portraying "a wide variety of sex activity," ranging from "relatively conventional sex" to "bizarre sexual practices." As to determining the community's attitude toward such materials, the court said the following:

"The most apparent factor in seeking to make that determination is that the community does not speak with any consensus. Without question a significant population is outraged and disgusted by such materials. It is equally clear, given the proliferation of such materials, that the approving and consuming public is enor-

mous. In my view, perhaps the largest element of the community and that closest to common ground expresses a view which tolerates the wishes of others to consume such adult materials privately and does not find them patently offensive *per se* unless publicly displayed · in an offensive manner.

Except where the corruption and exploitation of children are involved, public outcries against pornography and commercial sex activities in this community more often have to do with resentment of its intrusion into particular neighborhoods or with offensive display rather than with categorical objection to the existence of the materials or the activity."
(*quoting United States v. Various Articles of Obscene Merchandise, Schedule 1724,* 460 F.Supp. 826, 829 (S.D.N.Y.1978) (Leval, J.)). The district court further explained:

In seeking to determine whether the community standards are offended by these materials, I do not see how I can disregard the factor that these materials are being imported discreetly for private voluntary viewing.

I cannot disassociate my findings of community standards from the question whether the materials are to be used in offensive public display or in discreet privacy because I believe that these distinctions are a pertinent part of the community standards. The question of offensiveness is nearly impossible to disassociate from the context in which the material appears.

People are not offended in the abstract—they are offended in meaningful contexts. Consider whether the act of sexual intercourse performed by an adult man and woman is patently offensive to our community's standards. The question cannot be answered without information as to the circumstances. If the act is performed in the privacy of the bedroom, the answer will be "no". If performed on a stage erected on a busy and crowded public street at lunch time, the answer will undoubtedly be "yes". I have no doubt that much of the communi-

ty would find even tame erotic materials to be offensive if displayed in public areas, on billboards or in any manner that inflicted it on unwilling viewers and children. On the other hand, I find in my attempt to determine the standards of the community that the majority view does not necessarily consider adult non-violent sex material patently offensive when it is discreetly and privately used by those who find it enjoyable.

.    .    .    .    .

[C]onsideration of the context of display is [not] forbidden in seeking to determine whether the community standards have been offended where the finder of fact concludes that the context is a significant factor affecting the community's attitude.

(footnote omitted). Thus, the court concluded, although some of the articles "might" be offensive if imported for purposes of commercial sale or public display, they were "not offensive to the community standards in their present form and under the circumstances of their importation." [10]

Books, magazines and motion pictures [11] are, of course, entitled to the protection of the First Amendment.[12] But when they contain material that is "obscene in the constitutional sense," *United States v. Delapia*, 433 F.2d 1252, 1254 (2d Cir. 1970), their distribution, or, as here, their very existence, may be regulated by the government without offending constitutional guarantees. "[O]bscenity is not protected by the freedoms of speech and press." *Roth v. United States*, 354 U.S. 476, 481, 77 S.Ct. 1304, 1307, 1 L.Ed.2d 1498 (1957). *Accord, Miller v. California, supra*, 413 U.S. at 23, 93 S.Ct. 2607. Thus, the problem presented in cases such as this one is two-

fold. First, the term "obscene" must be properly defined. As explained by Justice Rehnquist, "[t]he definition of obscenity . . . is not a question of fact, but one of law; the word 'obscene' . . . is not merely a generic or descriptive term, but a legal term of art." *Hamling v. United States*, 418 U.S. 87, 118, 94 S.Ct. 2887, 2908, 41 L.Ed.2d 590 (1974). Second, once the definition is arrived at, it must be applied to the facts of the specific case—a matter of considerable delicacy. " '[T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated . . . is finely drawn.' " *Bantam Books, Inc. v. Sullivan, supra*, 372 U.S. at 66, 83 S.Ct. at 637, *quoting Speiser v. Randall, supra*, 357 U.S. at 525, 78 S.Ct. 1332. It is our task on this appeal to determine whether the district judge properly discerned this line. It is our judgment that, under the teaching of the Supreme Court cases as they stand today, he did not.

■ It is well settled that the "obscenity" of an article seized pursuant to § 1305(a) is to be determined by reference to the *Miller* test. *See United States v. 12 200-ft. Reels of Film*, 413 U.S. 123, 129–30, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); *United States v. Various Articles of Obscene Merchandise, Schedule 1303, supra*, 562 F.2d at 190 & n.8; *United States v. One Reel of 35MM. Color Motion Picture Film Entitled "Sinderella"*, 491 F.2d 956, 957 (2d Cir. 1974). We need not consider on this appeal whether the articles in Schedule 1769, "taken as a whole, appeal to the prurient interest in sex." The district court found that they did. Nor need we consider whether these articles "have serious literary, artistic, political, or scientific value." The district

10. The court had concluded earlier that the materials were being imported for private enjoyment rather than commercial use, inferring this from the fact that no potential recipient of the materials was receiving more than a single copy of each item and from the fact that the address labels on the materials were handwritten rather than printed. Because we believe that the court below applied the wrong standard, we need not decide if this finding was clearly erroneous.

11. The district court found all of the "illustrated advertising" included in Schedule 1769 to be "patently offensive" and ordered it destroyed.

12. In relevant part, the Amendment guarantees that, "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . . ."

court found that they did not. But we are required to consider whether the district court properly applied to the seized articles the "patently offensive" part of the *Miller* test. We conclude that it did not.

■ In *Miller* the Court held that in order for a trier of fact to classify material as "obscene" it must find that the material "portray[s] sexual conduct in a patently offensive way." 413 U.S. at 24, 93 S.Ct. at 2615. As a "basic guideline" for this determination, the trier of fact is to decide "whether the work depicts or describes, in a patently offensive way, [specifically defined] sexual conduct . . . ." *Id.* The Court gave two "plain examples" of such depictions or descriptions:

(a) Patently offensive representations or descriptions of ultimate sex acts, normal or perverted, actual or simulated.

(b) Patently offensive representations, or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

413 U.S. at 25, 93 S.Ct. at 2615. Although the examples given by the Court do to some extent help clarify what the Court had in mind as to the types of activity displayed in "patently offensive" representations or descriptions of sexual conduct, they do not clarify what the Court meant by the term "patently offensive." In other words, we are told only that an example of a work which "depicts or describes, in a patently offensive way, [specifically defined] sexual conduct" is a work which contains "[p]atently offensive representations or descriptions" of certain specified sexual activity. The only other clues offered in *Miller* are references by the Court to "pornography" or "pornographic material," 413 U.S. at 18–19 n.2, 93 S.Ct. at 2615, "patently offensive 'hard core' sexual conduct," 413 U.S. at 27, 93 S.Ct. at 2616, and " 'hard core' pornography," 413 U.S. at 28, 93 S.Ct. 2665.

It has largely been left to us, then, the inferior federal courts, to infer the meaning of the term "patent offensiveness." [13]

There was no mention of the phrase "patently offensive" in *Roth v. United States, supra,* 354 U.S. 476, 77 S.Ct. 1304, the case that provides the starting point for obscenity analysis. In *Roth* the proper test for obscenity was held to be only "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U.S. at 489, 77 S.Ct. at 1311. Subsequently, however, in *Manual Enterprises v. Day, supra,* 370 U.S. 478, 82 S.Ct. 1432, Justice Harlan, announcing the judgment of the Court, found that the magazines there in question "cannot be deemed so offensive on their face as to affront current community standards of decency—a quality that we shall hereafter refer to as 'patent offensiveness' or 'indecency.' Lacking that quality, the magazines cannot be deemed legally 'obscene . . . .' " 370 U.S. at 482, 82 S.Ct. at 1434. He also referred to sexual conduct "portrayed in a manner so offensive as to make it unacceptable under current community *mores,*" *id.,* to "obnoxiously debasing portrayals of sex," *id.* at 483, 82 S.Ct. at 1434, to "material whose indecency is self-demonstrating," *id.* at 487, 82 S.Ct. 1432, to materials "offensive on their face," *id.* at 488, 82 S.Ct. 1432, and to materials "deemed to be beyond the pale of contemporary notions of rudimentary decency," *id.* at 489, 82 S.Ct. at 1438. Although Justice Harlan found the magazines there at issue "dismally unpleasant, uncouth, and tawdry," *id.* at 490, 82 S.Ct. 1432, they were held not to be obscene. Two years later, in *Jacobellis v. Ohio,* 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964), Justice Brennan, announcing the judgment of the Court, held that the film "The Lovers" was not obscene, at least in part be-

**13.** Webster's Third New International Dictionary offers the following assistance. The adverb "patently" is defined as meaning "in a patent manner," and is likened to the terms "clearly," "obviously," and "plainly." The term "patent" is defined as meaning "open to view" and "readily visible or intelligible," and is likened to the terms "evident" and "obvious." The adjective "offensive" is defined as "giving painful or unpleasant sensations" or as "causing displeasure or resentment," and is likened to the terms "nauseous," "obnoxious," "revolting," "insulting" and "affronting."

cause it was not " 'substantially beyond customary limits of candor in description or representation of [sexual] matters.' " *Id.* at 191, 84 S.Ct. at 1680. *See Roth v. United States, supra,* 354 U.S. at 487 n.20, 77 S.Ct. 1304. In *Jacobellis,* Justice Stewart filed his now famous concurring opinion, which reads in part:

> [C]riminal laws in this area are constitutionally limited to hard-core pornography. I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that.

378 U.S. at 197, 84 S.Ct. at 1683 (footnote omitted).

In *Memoirs v. Massachusetts,* 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), the Court adopted a new test for obscenity:

> [I]t must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) *the material is patently offensive because it affronts community standards relating to the description and representation of sexual matters*; and (c) the material is utterly without redeeming social value.

383 U.S. at 418, 86 S.Ct. at 977 (emphasis added). The Court went on to note that, *assuming* that "prurient appeal" and "patent offensiveness" had been demonstrated, "the circumstances of production, sale, and publicity" may be used as relevant to the question whether the material is utterly without redeeming social value. 383 U.S. at 420, 86 S.Ct. at 978.[14]

The Court expanded on the use of context or circumstance as relevant to the determination of "obscenity" in *Ginzburg v. United States,* 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966), holding in effect that advertisements which were "not themselves obscene," 383 U.S. at 465 n.4, 86 S.Ct. 942, could be deemed so in light of "the setting in which the publications were presented." 383 U.S. at 465, 86 S.Ct. at 944–45. The Court found evidence of "pandering" relevant "in close cases" to the questions of prurient appeal and social value. *See also Pinkus v. United States,* 436 U.S. 293, 303, 98 S.Ct. 1808, 56 L.Ed.2d 293 (1978); *Hamling v. United States, supra,* 418 U.S. at 130, 94 S.Ct. 2887, 2914 ("evidence of pandering could be relevant in the determination of the obscenity of the materials at issue, as long as the proper constitutional definition of obscenity is applied"); *Kois v. Wisconsin,* 408 U.S. 229, 231–32, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972); *Milky Way Productions, Inc. v. Leary,* 305 F.Supp. 288, 294–95 (S.D.N.Y.1969) (three judge court), *aff'd,* 397 U.S. 98, 90 S.Ct. 817, 25 L.Ed.2d 78 (1970). *Compare United States v. 31 Photographs,* 156 F.Supp. 350 (S.D.N.Y.1957). With regard to "patent offensiveness," however, the Court made only the following comment:

> The deliberate representation of [the] publications as erotically arousing . . . would tend to force public confrontation with the potentially offensive aspects of the work; the brazenness of such an appeal heightens the offensiveness of the publications to those who are offended by such material.

383 U.S. at 470, 86 S.Ct. at 947.[15] *Accord, Splawn v. California,* 431 U.S. 595, 597–98, 97 S.Ct. 1987, 52 L.Ed.2d 606 (1977).

---

**14.** Justice Harlan dissented from the Court's decision, adopting Justice Stewart's *Jacobellis* analysis and concluding that federal suppression of "obscenity" should be limited to "hard-core pornography," *i.e.,* "prurient material that is patently offensive or whose indecency is self-demonstrating," *i.e.,* "gross pornography." *Memoirs v. Massachusetts,* 383 U.S. 413, 457, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) (Harlan, J., dissenting).

**15.** Justice Stewart dissented, and offered a possible definition of the term "hard core pornography:"

> ". . . Such materials include photographs, both still and motion picture, with no pretense of artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgy-like character. They also include strips of drawings in comic-book format grossly depicting similar activities in an ex-

Since *Miller,* the Supreme Court has provided additional insight into how the term "patent offensiveness" is to be interpreted. For example, in *Kaplan v. California,* 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973), the Court declared that expression by words alone may be held "legally obscene" if upon reading it the Court can describe it as being "made up entirely of repetitive descriptions of physical, sexual conduct, 'clinically' explicit and offensive to the point of being nauseous." 413 U.S. at 116, 93 S.Ct. at 2683. In *United States v. 12 200-ft. Reels of Film, supra,* 413 U.S. 123, 93 S.Ct. at 2670, the Court indicated that there was a certain "substantive" aspect to the *Miller* examples: "If and when . . . a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' 'indecent' or 'immoral' as used to describe regulated material in [federal statutes], we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in *Miller v. California* . . . ." 413 U.S. at 130 n.7, 93 S.Ct. at 2670. And in *Hamling v. United States, supra,* 418 U.S. 87, 94 S.Ct. 2887, the Court did precisely that, explaining that "*Miller* undertook to set forth examples of the types of material which a statute might proscribe as portraying sexual conduct in a patently offensive way." 418 U.S. at 113–14, 94 S.Ct. at 2906. The Court went on to say:

> *Miller,* in describing the type of material which might be constitutionally proscribed . . . was speaking in terms of substantive constitutional law of the First and Fourteenth Amendments. . . . While the particular descriptions there contained were not intended to be ex-

haustive, they clearly indicate that there is a limit beyond which neither legislative draftsmen nor juries may go in concluding that particular material is "patently offensive" within the meaning of the obscenity test set forth in the *Miller* cases.

418 U.S. at 114, 94 S.Ct. at 2906.

In *Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974), decided the same day as *Hamling,* the Court considered the question whether the popular film entitled "Carnal Knowledge" was "patently offensive." The Georgia court held that it was; the Supreme Court held that it was not. The Court acknowledged that the question of "patent offensiveness" was "essentially a question of fact," but went on to hold that the fact finder does not have "unbridled discretion in determining what is 'patently offensive.'"

> While [the *Miller* list of examples] did not purport to be an exhaustive catalog of what juries might find patently offensive, it was certainly intended to fix substantive constitutional limitations, deriving from the First Amendment, on the type of material subject to such a determination.

418 U.S. at 160–61, 94 S.Ct. at 2755. Using this analysis, the Court held that the film was not "patently offensive" because its scenes were neither "within either of the two examples given in *Miller*" nor "sufficiently similar to such material to justify similar treatment." [16] "[T]he film could not, as a matter of constitutional law, be found to depict sexual conduct in a patently offensive way." 418 U.S. at 161, 94 S.Ct. at 2755.

This analysis was again employed in *Smith v. United States,* 431 U.S. 291, 97

---

aggerated fashion. There are, in addition, pamphlets and booklets, sometimes with photographic illustrations, verbally describing such activities in a bizarre manner with no attempt whatsoever to afford portrayals of character or situation and with no pretense to literary value. All of this material . . . cannot conceivably be characterized as embodying communication of ideas or artistic values inviolate under the First Amendment. . . ."

*Ginzburg v. United States,* 383 U.S. 463, 499 n.3, 86 S.Ct. 942, 957 n.3, 16 L.Ed.2d 31 (1966) (quoting the Solicitor General's brief).

**16.** The Court explained further that "the camera does not focus on the bodies of the actors" during the scenes in which "ultimate sexual acts" are understood to be taking place, and that the film contained no exhibition of the genitals, lewd or otherwise.

S.Ct. 1756, 52 L.Ed.2d 3241 (1977), where the Court described the criterion of "patent offensiveness" not only as an "underlying question of fact[ ]" to be determined in light of "contemporary community standards," but also as a standard containing a "substantive component." 431 U.S. at 300–01, 97 S.Ct. 1756. "The kinds of conduct that a jury would be permitted to label as 'patently offensive' . . . are the 'hard core' types of conduct suggested by the examples given in *Miller*." 431 U.S. at 301, 97 S.Ct. at 1764. The Court referred to these kinds of conduct as "substantive conduct" the portrayal of which may be held to be "patently offensive." 431 U.S. at 303, 97 S.Ct. 1756. Of particular relevance to the appeal now before us is a comment made by Justice Stevens in dissent: "The standard now applied by the Court focuses its attention on the content of the materials and their impact on the average person in the community." 431 U.S. at 317, 97 S.Ct. at 1772. And in *Ward v. Illinois*, 431 U.S. 767, 97 S.Ct. 2085, 52 L.Ed.2d 738 (1977), the Court held that, although the *Miller* examples did not include depictions of sado-masochistic sexual behavior, depictions of such conduct could nevertheless be found "patently offensive." The Court reasoned that the *Miller* examples "gave substantive meaning" to the "patent offensiveness" portion of the *Miller* test " 'by indicating the kinds of materials within its reach,' " 431 U.S. at 775, 97 S.Ct. at 2089, but that because the examples "were not intended to be exhaustive," 431 U.S. at 773, 97 S.Ct. at 2090, *quoting Hamling v. United States, supra*, 418 U.S. at 114, 94 S.Ct. 2887, the real question to be asked is whether the material in question is "the sort of" material described in *Miller, i. e.,* "specific hardcore sexual conduct." The Court characterized this as the *Miller* "specificity requirement," 431 U.S. at 775, 97 S.Ct. 2085, and held the requirement satisfied.

▮ To summarize, in order for a portrayal of sexual conduct to be "patently offensive," as that term has been used by the Supreme Court, it must at a minimum be a depiction, description or representation either of the activities listed in the *Miller* examples or of activities "sufficiently similar" to those activities to justify similar treatment. Once this "substantive component" is satisfied, the question becomes whether, as a matter of fact, the portrayal is "patently offensive" in light of "contemporary community standards." And, as explained by the Court in *Smith*, "contemporary community standards must be applied by [the fact finder] in accordance with [its] own understanding of the tolerance of the average person in [its] community." 431 U.S. at 305, 97 S.Ct. at 1766. It is with this as background that we evaluate the district court's use of the inferred intention of the addressees to enjoy the seized articles privately as relevant to the question whether those articles are "patently offensive."

▮ It is our judgment that the district court's method of analysis is not supported by the relevant Supreme Court pronouncements. In reaching its own conclusions as to the "patent offensiveness" of allegedly "obscene" materials, the Supreme Court has referred only to the "works," or to the "portrayals" of sexual activity, or to the "depiction," "representation or description" of that conduct. There has been no mention of the context in which those works were to be viewed by the owner, nor has there been mention of their intended private use. The assumption throughout the development of this area of the law has been that the portrayal of sexual activity either is or is not "patently offensive." The question which the Supreme Court is instructing the lower courts to ask in this regard is as follows: Is, as a matter of fact, the depiction, description or representation of sexual conduct contained in the article in question "patently offensive" under "contemporary community standards"? As explained above, some portrayals of sexual conduct may not, as a matter of substantive constitutional law, be found to be "patently offensive." Their content must be either that content mentioned in the *Miller* examples or "sufficiently similar" to that content to justify similar treatment. But the manner in which sexual conduct is depicted, described or represented in allegedly ob-

scene materials is not affected by the manner or place in which the materials themselves either are, or are intended to be, used and enjoyed. Under the Supreme Court cases handed down to date, such information is simply not relevant to the determination of the materials' "patent offensiveness." [17] For this reason, we must vacate the district court's order that the materials be released and remand for further consideration of the question of the "patent offensiveness" of these articles in light of contemporary community standards." *See, e. g., Hamling v. United States, supra,* 8 U.S. at 125–26, 94 S.Ct. 2887; *United States v. Various Articles of Obscene Merchandise, Schedule 1303, supra,* 562 F.2d at 1; *id.* at 191 (remand "to gauge the reaction of the community when, as and if it viewed [the materials]"), *quoting United States v. One Reel of 35 MM. Color Motion Picture Film Entitled "Sinderella," supra,* 491 F.2d at 958; *United States v. Manarite,* 44 F.2d 583, 593 (2d Cir.), *cert. denied,* 404 U.S. 947, 92 S.Ct. 298, 30 L.Ed.2d 264 (19); *United States v. 35 MM. Motion Picture Film Entitled "Language of Love," supra,* 432 F.2d at 715 n.7; *United States v. Wild,* 422 F.2d 34, 35–36 (2d Cir. 1969), *cert. denied,* 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971); *United States v. One Carton Positive Motion Picture Film Entitled "491", supra,* 367 F.2d at 896; *id.* at 905 (Waterman, J., concurring). *See also United States v. 2,200 Paper Back Books,* 565 F.2d 56, 569–71 (9th Cir. 1977).

17. This conclusion is bolstered, albeit indirectly, by *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 2 L.Ed.2d 542 (1969), and its progeny. In *Stanley,* the Court held that the mere possession of concededly obscene materials in the privacy of one's home cannot be prohibited. Soon, however, the Court held that the right to possess obscene materials in one's home does not imply or establish the right of others to distribute those materials or the right to carry them into the country from overseas. *United States v. Reidel,* 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971); *United States v. 37 Photographs, supra,* 402 U.S. 363, 91 S.Ct. 1400. And in 1973 the Court held that § 1305(a) constitutionally proscribes the importation of obscene matter, notwithstanding the fact that the material is solely for the importer's private use. *United States v. 12 200-ft. Reels of Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500

The district court's order that certain of the allegedly obscene articles be released to their addressees is vacated; the judgment of the district court is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings not inconsistent with this opinion.[18]

(1973). *See also United States v. Orito,* 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973). None of these cases raised questions regarding the actual definition of the term "obscenity." Nonetheless, there is no hint in any of these decisions that the intended private use of the materials in any way reflected on the question whether the materials were themselves "obscene."

18. The government is instructed to notify promptly the addressees of the articles determined by the district court not to be obscene by the decision of this Court announced today and the schedule, location, and nature of the proceedings to be held in the district court as a result of today's decision. The details of this notification are to be arrived at in consultation with the district judge.