UNITED STATES of America,
Appellant,

v.

VARIOUS ARTICLES OF OBSCENE
MERCHANDISE, SCHEDULE NO.
1303, Appellee.

No. 749, Docket 76–6152.

United States Court of Appeals,
Second Circuit.

Argued May 17, 1977.

Decided Sept. 15, 1977.

Mulligan, Circuit Judge, filed concurring opinion.

Frederick P. Schaffer, Asst. U.S. Atty., New York City (Robert B. Fiske, Jr., U.S. Atty. for the Southern District of New York, and Stuart I. Parker, Asst. U.S. Atty., New York City, of counsel), for appellant.

Joel M. Gora, New York City (American Civil Liberties Union, and Wayne N. Outten, New York University School of Law, New York City, of counsel), for appellee.

Before MOORE, SMITH and MULLIGAN, Circuit Judges.

MOORE, Circuit Judge:

The Congress, obviously believing that it was reflecting the opinion of its collective constituencies throughout the Nation, has enacted a statute under the title of "Immoral articles; importation prohibited". 19 U.S.C. § 1305. Listed under (a) thereof is a curious assortment of immoral articles, e. g., those writings "advocating or urging treason or insurrection against the United States"; obscene publications; drugs for causing unlawful abortions; and lottery tickets. Entry of such articles into the United States is prohibited. The entire contents of any package containing a pro-

hibited article are subject to confiscation "unless it appears to the satisfaction of the appropriate customs officer that the obscene or other prohibited articles contained in the package were inclosed therein without the knowledge or consent of the . . consignee . . . ." Additional censorship beyond some employee of the customs office is granted to the Secretary of the Treasury, who when not engaged in the fiscal affairs of the Nation may, in his discretion, read the books declared by customs to be obscene to decide whether they are "classics or books of recognized and established literary or scientific merit". If he so finds, he may admit them as long as they are only imported for "noncommercial purposes".

The procedure prescribed is equally interesting. The customs employee is directed to seize the in-his-opinion offending article to wait the judgment of a district court thereon. To this end, the customs employee must transmit the article "to the district attorney of the district in which is situated the office at which such seizure has taken place", and he, undoubtedly through one of his assistants, "shall institute proceedings in the district court" for the confiscation and destruction of the matter seized.

Some Assistant United States Attorney prepares a complaint whereby he demands judgment that the article is obscene and declares that he wants it destroyed. He attaches a schedule of all seized items (usually a week's collection) and prays that all interested persons be duly cited to answer. To all addressees he then sends a notice, giving them 20 days in which to file a claim, together with a form for such claim and answer. Upon receipt of such claims, if any, the matter is set for a so-called hearing before a District Judge. The notice to the addressees does not appear to advise them of their right to a trial by jury, but this right can be claimed.

The institution of court proceedings adds to the two primary censors, the customs employee and the Assistant United States Attorney, a District Judge and, potentially, three Court of Appeals Judges and nine Supreme Court Justices.

Against this procedural background, we turn to the facts of the case before us.[1] A young factory worker, a resident of Lancaster, Pennsylvania, had a friend in Germany who, knowing of the American's interest in matters pornographic, sent him, unsolicited, the pamphlet seized by customs (hereinafter referred to as Exhibit 8). Exhibit 8 consists of a dozen or more pages, in color, of a young man and two young women, in varying combinations, engaged in diverse postures of sexual acts. To avoid offending readers by using the English equivalents, the courts generally describe some of the acts by the Latin words *fellatio* and *cunnilingus*—testimony to the fact that the Romans, as undoubtedly the Greeks, Egyptians and Assyrians before them, were quite familiar with these practices.[2] Since the customs officer did not inquire whether Exhibit 8 was shipped without the knowledge or consent of the consignee, we will assume that he would at least have been a willing recipient. Indeed, the young man from Lancaster later testified that he found the pictures of the type in Exhibit 8 more "entertaining" than watching football or baseball games. App. at 147–48.

Not surprisingly, Exhibit 8 was seized by the customs officer at the port of entry, namely, New York City. It was one magazine among a large number (over 500) of printed articles seized by customs officials at the time, all of which were listed in the same complaint filed in the district court. Schedule 1303, attached to the complaint and listing the articles seized as well as the mailing destinations, includes some 573 addressees located in some 48 states. Of the 50 states, only 2, Colorado and North Dakota, failed to have residents exhibiting some "prurient interest", or at least curiosity.

1. It is the duty of the courts to make "an independent review of the facts of each case". *Jacobellis v. Ohio*, 378 U.S. 184, 189, 84 S.Ct. 1676, 1678, 12 L.Ed.2d 793 (1964).

2. It would appear that as early as the twin cities of Sodom and Gomorrah communities were establishing their own local standards of sexual conduct.

Most of the items seized were listed only as "Illustrated Advertising". The titles of the other so-called magazines were "Weekend Sex", "Nympho", "Children Love", "Anal Sex", "Sexual Positions", and similar designations.

The addressees were duly notified of the seizure of their intended materials. A few of the comments made by those who replied are interesting: "I intend to fight for my right to choose my own reading material without Government censorship"; "I resent that anyone is censoring my mail . . ." App. at 81, 97.

Of the 573 addressees, only 14 filed claims seeking release of the materials addressed to them. None of these fourteen were residents of the Southern District of New York. And only a doctor in California successfully convinced the Government to release the material addressed to him. He was the recipient of 19 magazines, including "Sex Art", "Nympho", and others. The Assistant United States Attorney apparently singled him out to inquire whether the 19 magazines were ordered "solely in connection with your medical practice". The doctor, a specialist in Obstetrics and Gynecology, replied that he had ordered the magazines "solely in connection with my gynecological practice . . . to see if they would be useful in counseling patients with sexual problems". He did not foreclose the possibility that he might "personally become titillated if [he] should look at these representations", App. at 95, but his reasoning apparently satisfied the censors and he received his magazines. It may be asked why a diplomate in his field would need the 19 magazines when his lack of knowledge might have been remedied by the *Kama Sutra* or *The Joy of Sex*, which has been on *The New York Times* list of best sellers for months.

At the trial, only the Lancaster claimant, *pro se*, and an Assistant United States Attorney appeared. The claimant testified that the Mayor of Lancaster, not knowing precisely how to formulate a local policy regarding pornography after then-recent Supreme Court decisions [presumably *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and related cases], had "selected some citizens to try and formulate some sort of basis to go on of what the city should do dealing with obscene material". App. at 148. The claimant was himself a member of the resulting Lancaster Advisory Committee on Community Standards on Pornography. He produced a copy of a Lancaster newspaper which purportedly summarized the Committee's conclusion that "since [Lancaster] has tolerated restricted and X-rated movies to be shown, community standards have been acknowledged". The Committee recommended an end to all controls on pornography except where children were involved. App. at 148–49; Exhibit A.[3]

Asked by the Court whether he desired to state his position, the claimant made one final comment, revealing rather sagacious consideration of the problem, saying "that it seems unusual for the United States Government to spend an awful lot of time and money and effort for one small mail article . . . when there is obviously better use for that money to be spent in the judicial system . . . ." App. at 154. He then added that similar matter was available in New York and anywhere else in the country, a fact of which the Court could fairly have taken judicial notice.[4]

The District Court, during the hearing, stated that "the interest of justice would be

---

3. There is no reason to believe that the views of the Mayor's Committee fully reflected "contemporary community standards" or that the Committee was any more qualified to do so than a judge or jury. *See Smith v. United States*, 431 U.S. 291, 308, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977).

4. Judges in metropolitan areas en route from their homes to their ivory towers, when purchasing their morning newspaper, cannot be unaware of the burgeoning number of pornographic magazines (a score or more) on the newsstands. Furthermore, judicial notice can be taken of the fact that every large city has its adult movies and book-store enclaves, some of which seem to reach out to the countryside as well.

better served by a lawyer's presentation on both sides rather than your [claimant's] handling this for yourself as a layman" and suggested that claimant seek assistance from the American Civil Liberties Union (ACLU) or a member of a law faculty. App. at 157. With the same enterprise shown by his coming to New York to make his claim, the claimant has obtained aid from both. Thus, the District Court had the benefit of legal representation of claimant—as do we on appeal, for the ACLU and an attorney from the New York University School of Law have filed a substantial brief.

In its opinion, the District Court was genuinely concerned about the opening of mail by customs agents without prior judicial approval, though this issue was "bypassed" in view of the decision on other grounds. App. at 165–66. The Supreme Court has since resolved any doubts about the propriety of the customs agents' actions. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). The District Court addressed itself primarily to the propriety of § 1305's procedure for determining whether the magazine mailed to the claimant was obscene. Specifically, the Court inquired as to which community's standards were to be applied by the appropriate fact-finder, *i. e.*, whether a court or jury at the port of entry should determine obscenity or whether that issue could properly be handled only by a fact-finder drawn from the locale of the addressee.

After considering a large number of reported cases, the Court reasoned that it was not for a judge or jury in the "happenstantial port of entry to become the arbiter of taste and decency for recipients of mail everywhere". App. at 171. Therefore, the Court concluded that obscenity should be determined by a fact-finder in the district of the claimant's residence "under the standards of the community to which the questioned mail is addressed". App. at 172.

The Court thereupon held that § 1305(a) offends the First Amendment "in (a) depriving claimants and their local communities of the freedom to read and see things in accordance with their own standards of what is or is not obscene, and (b) failing to afford a less onerous and expensive procedure for the vindication of First Amendment claims to items seized".[5] App. at 175. The Court believed that the procedural invalidity could be eliminated "by stating in the notice to potential claimants that they have a right to have the issues heard in the district of their residence or of the destination of the mail matter". App. at 176. The Court found that because no such notice had been given to the claimant "his claim should be sustained without reaching the merits of the issue of obscenity", but stated as an alternative ground for dismissal the Government's failure to prove the material "obscene within the local community standard of Lancaster, Pennsylvania". App. at 176.

From this decision the Government appeals, asserting as error the Court's holdings: (1) that applicable community standards of obscenity should be those of the addressee's residence, and (2) that the claimant had the right to have his claim referred to the district of his residence or that of the article's destination.

Were we drafting new legislation on the subject, we would find the District Court's delineation of the problems attendant thereto quite accurate—but we are not. Our task in this case is limited to interpreting and enforcing the statute reflecting Congress's (and presumably the People's) will. Importation of an obscene pamphlet or picture is prohibited. Import implies entry into the country. Entry, of necessity, must be made at specific places, referred to as ports of entry. These ports of entry are manned by customs officers who are the

---

5. By contrast, in *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) and subsequent cases, see *Smith v. United States supra*, the Supreme Court held that 18 U.S.C. § 1461, proscribing "[e]very obscene, lewd, lascivious, indecent, filthy or vile article"

does not offend the guarantees of the First Amendment. The District Court's focus on the individual's burden under the Government's procedures for implementing 19 U.S.C. § 1305 was derived from *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

only persons on the premises available to make a decision. In fact, the statute provides that seizure shall be made by "the appropriate customs officer". Congress must have known when enacting the statute that there were not customs officers in every city, town and hamlet of the United States. Therefore, inspection would have to take place at the port of entry—in this case, New York. Thereafter, judicial proceedings are to be conducted in "the district in which is situated the office at which such seizure has taken place", here, the Southern District of New York. Nothing in the statute, by implication or otherwise, indicates or justifies reference for adjudication to the district of the addressee's residence. Interesting though such a procedure might be to the prosecutors and judges in the hinterland, it would be without statutory authority.

As for applying "local community standards", even greater practical obstacles arise. Obviously, the rules with respect to selection of jurors would prohibit bringing twelve jurors from Lancaster to New York. Query, in any event, whether residents of Lancaster could properly testify as experts (in the manner of presenting foreign law) with respect to their local *mores*. Furthermore, the statute does not make them the censors; it designates only the customs employee, the United States Attorney (undoubtedly an Assistant) and the courts.

Moreover, as for obscene foreign imports, the Supreme Court decision in *United States v. 12 200-Ft. Reels of Super 8 MM. Film*, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), in construing § 1305, not only held that the claimant had no First Amendment right to import obscene materials for private use, but pointed out that import restrictions and searches of packages at the national borders "rest on different considerations and different rules of constitutional law from domestic regulations". 413 U.S. at 125, 93 S.Ct. at 2667. The Court acknowledged the "plenary power" of Congress to prevent imports and, quoting from *Weber v. Freed*, 239 U.S. 325, 329, 36 S.Ct. 131, 60 L.Ed. 308 (1915), emphasized the "complete power of Congress over foreign commerce and its authority to prohibit the introduction of foreign articles . . . ." 413 U.S. at 126, 93 S.Ct. at 2668.

*Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), was undoubtedly written with the well-intentioned purpose of clarifying obscenity standards once and for all. The scores of cases cited to us and the District Court's statement that "there has been no consensus among the lower federal courts as to which community's standards *Miller* meant to tap", App. at 169, embolden us, though with some trepidation, to suggest that much of the difficulty arises from the use of the expression "community standards". *Miller* itself recognized that "the absence, since [*Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)], of a single majority view of this Court as to proper standards for testing obscenity has placed a strain on both state and federal courts". 413 U.S. at 29, 93 S.Ct. at 2617. Indeed it has. There is no point in reviewing the many cases on the general subject. As the Supreme Court seemed to suggest in *Miller*, concentration should be on the facts of each case, allowing a moderate, common sense approach.

In reality, no judge or jury can be expected to determine "community standards" with respect to Exhibit 8. *See Smith v. United States*, 431 U.S. 291, 314, 97 S.Ct. 1756, 52 L.Ed.2d 324 and note 10 (1977) (dissenting opinion of Justice Stevens). The best that anyone can do is to give his or her personal reaction to it. No juror or judge armed with a copy of Exhibit 8 will have the opportunity to rush up and down the streets of his community asking friends and neighbors how they feel about it.[6] Nor should they rudely seek insights

---

**6.** Even this method of trying by such a survey to ascertain the community's reaction might not be entirely determinative. In *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), a survey of San Diego residents with respect to the brochure in question was excluded by the trial judge. The exclusion was affirmed by the Supreme Court. 418 U.S. at 127, 94 S.Ct. 2887. Yet if "local" standards

into community *mores* by asking others what their intimate sexual practices may be. Yet the fiction remains that a jury is somehow capable of reflecting or determining "community standards". This is so probably because there is simply no better method for applying this test.

█ It is unfortunate, as has been reiterated countless times by many judges, that these matters have to come before the courts. But the law is on the books and someone must enforce it. We are now concerned only with importation and the law applicable thereto. As we would summarize the law, the customs employee had a right to open the mail and to exercise his discretion in declaring Exhibit 8 obscene; the United States Attorney was under a duty to issue a complaint for confiscation and destruction; the complaint was properly issued in the district of the seizure; and the determination thereof properly made in that district. Conversely, the claimant has no right to have the case transferred to, or heard in, the district of his home.

Since we believe that the law in its present state differs from the District Court's fundamental premises that the claimant has a right to have the issues heard in the district of his residence and that the Government was under a duty to prove that Exhibit 8 is obscene within the local community standards of Lancaster, Pennsylvania, we must reverse and remand to the Court for a determination by it in the Southern District of New York as to whether Exhibit 8 is obscene.

The Government's case consists solely of Exhibit 8, which, it says, speaks for itself—in effect a *res ipsa loquitur* doctrine. The Supreme Court gave credence to this doctrine in *Jacobellis v. Ohio*, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964). It had viewed the film in question, "Les Amants", and declared it "not obscene within the standards enunciated in *Roth v. United States* and *Alberts v. California*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 . . ." 378 U.S. at 196, 84 S.Ct. at 1682. Again in *Jenkins v. Georgia*, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974), the Court used its own visual reaction as its standard, saying:

> "Our own viewing of the film satisfies us that 'Carnal Knowledge' could not be found under the *Miller* standards to depict sexual conduct in a patently offensive way." 418 U.S. at 161, 94 S.Ct. at 2755.

Mr. Justice Stewart emphasized his approach in his comment: "I know it when I see it . . . ." *Jacobellis, supra,* 378 U.S. at 197, 84 S.Ct. at 1683 (concurring opinion).[7]

Although the legal issue in *Smith v. United States, supra,* was somewhat different from that presented here, that case's interpretation of *Miller v. California, supra,* is pertinent. The *Miller* standards, albeit stated as " 'basic guidelines' for the trier of fact in a state obscenity prosecution", were held to be "equally applicable to federal legislation." 431 U.S. at 299, 97 S.Ct. at 1763, *quoting Miller, supra,* 413 U.S. at 24, 93 S.Ct. at 2615.[8] In summary, the Court decided that a jury [in this case the District Court] in deciding "contemporary community standards" is entitled to rely on its own knowledge of community standards to decide "the questions of appeal to prurient interests and patent offensiveness". 431 U.S. at 302, 97 S.Ct. at 1764.[9]

---

be the test, such proof would seem to have been highly relevant.

**7.** *Jacobellis* assumes greater significance when it is realized that Jacobellis was convicted by a court of three judges (a jury trial having been waived), and the conviction was affirmed by an intermediate appellate court and the Supreme Court of Ohio. Thus, the only question was whether this substantial group of state judges had properly found the film to be obscene. They obviously had all seen the film and had

concluded that it was obscene. The Supreme Court, however, concluded otherwise.

**8.** In *Smith*, the federal statute was 18 U.S.C. § 1461; here it is 19 U.S.C. § 1305.

**9.** The *Miller* guidelines were set forth in *Smith* as follows:

> "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest . . . ;

On remand the District Court will have to follow the Supreme Court's injunction that "contemporary community standards must be applied . . . in accordance with [the District Court's] own understanding of the tolerance of the average person in [its] community", and that it "consider the entire community and not simply [its] own subjective reactions, or the reactions of a sensitive or of a callous minority." *Smith v. United States, supra,* at 305, 97 S.Ct. at 1766.

◼ In *United States v. One Reel of 35 MM Color Motion Picture Film Entitled "Sinderella", Sherpix Inc.,* 491 F.2d 956 (2d Cir. 1974), the Government's case, as here consisted solely of placing the material in evidence and exhibiting it to the Court. On remand we can only say, as we did there, that the Judge, as the trier of fact, must

"decide as a matter of fact whether the *Miller* 'basic guidelines' have been met. . . . His task [is] to gauge the reaction of the community when, as and if it viewed [Exhibit 8]." 491 F.2d at 958.

The District Court will have to serve as a composite for a Southern District jury— possibly representing the rural areas of Rockland and Dutchess Counties together with the urban sections of Manhattan and the Bronx.[10] The Court will have to decide the question of obscenity "according to the average person in the community, rather than the most prudish or the most tolerant". *Smith v. United States, supra,* 431 U.S. at 304, 97 S.Ct. at 1765. Thus, the "average person" takes his or her stand beside the hypothetical and court-created mythical character "the reasonably prudent man". *See id.; Hamling v. United States,* 418 U.S. 87, 104–105, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). Again, there is probably no better way.

Shades of Anthony Comstock[11] still hover over our obscenity statutes. But as long as they remain on the books it is the duty of Government to enforce them within constitutional limits.

Reversed and remand for further proceedings in accordance with this opinion.

MULLIGAN, Circuit Judge (concurring):

I concur in the judgment of reversal. Judge Frankel found that the procedure set forth in 19 U.S.C. § 1305(a) offended the First Amendment because it deprived the claimants and their local communities of the freedom to read and see things in accordance with their own standards of what is or is not obscene. However, here the claimants have imported into the United States matter which is allegedly obscene and the criterion of obscenity to be applied is a federal question. This distinction was emphasized in *Smith v. United States,* 431 U.S. 291, 97 S.Ct. 1756, 1768, 52 L.Ed.2d

---

(b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and
(c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 431 U.S. at 299, 97 S.Ct. at 1763, *quoting* 413 U.S. at 24, 93 S.Ct. at 2615.
These guidelines were embellished by "plain examples" from *Miller,* namely:
"(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.
(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals," 431 U.S. at 301, 97 S.Ct. at 1764, *quoting* 413 U.S. at 25, 93 S.Ct. at 2615.

10. Despite this technical jury selection limitation, the Supreme Court in *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), said:
"But this is not to say that a district court would not be at liberty to admit evidence of standards existing in some place outside of this particular district, if it felt such evidence would assist the jurors in the resolution of the issues which they were to decide." 418 U.S. at 106, 94 S.Ct. at 2902.
By a parity of reasoning, a judge would be similarly permitted to draw upon his own knowledge of community reaction beyond the District's territorial boundaries.

11. Zealot leader of the New York Society for Suppression of Vice around the turn of the century (b. 1844 d. 1915).

324 (1977), decided after the opinion of the district court was filed.

Just as the individual's right to possess obscene material in the privacy of his home, however, did not create a correlative right to receive, transport or distribute the material, the State's right to abolish all regulation of obscene material does not create a correlative right to force the Federal Government to allow the mails or the channels of interstate or foreign commerce to be used for the purpose of sending obscene material into the permissive State.

Therefore, the issue of whether the material is in violation of 19 U.S.C. § 1305(a) is clearly not to be determined by the Mayor's Committee of Lancaster, Pennsylvania or even the legislature of the Commonwealth of Pennsylvania but by the Congress which concededly has "plenary power" to proscribe the importation of obscene material. *United States v. 12 200 ft. Reels of Super 8 mm. Film*, 413 U.S. 123, 126, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973).

The offense is the importation of the material, not the reading of it. The statute here evinces a clear congressional intent that the venue for the judicial determination of the obscenity of the imported material shall be the port of seizure. It logically follows that the community standard must be that of the situs of the court and not that of the residence of the addressee. Congress may determine "what articles may be imported into this country and the terms upon which importation is permitted." *Board of Trustees of the University of Illinois v. United States*, 289 U.S. 48, 57, 53 S.Ct. 509, 77 L.Ed. 1025 (1933). That this congressional determination may increase the expense or inconvenience of the claimant in contesting the seizure does not result in any constitutional infirmity. *Cf.*

*Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *Ortwein v. Schwab*, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973). See also *Person v. Association of the Bar*, 554 F.2d 534 (2d Cir. 1977).

I therefore agree with the majority that the only community standard which can be applied is that of the Southern District of New York. The finder of fact, however, is not free to determine the issue on the basis of his personal, idiosyncratic reaction to it. "[J]uries must be instructed properly so that they consider the entire community and not simply their own subjective reactions, or the reactions of a sensitive or of a callous minority." *Smith v. United States, supra*, 431 U.S. at 305, 97 S.Ct. at 1766. How difficult the determination of this issue will be obviously depends upon how blatantly offensive the material may be. See *United States v. Cangiano*, 491 F.2d 906, 914 (2d Cir. 1976). I cannot agree that it is "unfortunate" that these matters have to come before the court. It is unfortunate that the hard core pornography industry is apparently flourishing despite the efforts of national, state and local communities to curb it. When violations of the restrictions against pornography occur it is the duty of the prosecutor to enforce the law and the courts to apply it. I see no reason to flinch from the exercise.