UNITED STATES of America,
Plaintiff-Appellee,

v.

John S. LANGFORD,
Defendant-Appellant.

No. 81–2503.

United States Court of Appeals,
Seventh Circuit.

Submitted May 21, 1982.*

Decided Sept. 2, 1982.

As Modified Sept. 8, 1982.

Rehearing Denied Jan. 26, 1983.

* The parties waived oral argument and the appeal was therefore submitted for decision on the briefs and record.

Stephen P. Hurley, Madison, Wis., for defendant-appellant.

John R. Byrnes, U. S. Atty., Madison, Wis., for plaintiff-appellee.

Before PELL, WOOD and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

This is an appeal from a judgment of conviction entered in the United States District Court for the Western District of Wisconsin, Barbara B. Crabb, Judge. The defendant was convicted on three counts of violating 18 U.S.C. § 2252 with knowingly sending through the U. S. Mails obscene visual and printed material depicting minors engaging in sexually explicit conduct after the jury was instructed to apply the community standards of the jurisdiction from which the materials were mailed (sending jurisdiction) in determining if the materials are obscene. The conviction is also based upon the district court's determination that the mailing of obscene negatives to a photography laboratory for developing is a mailing of obscene visual or print material for the purpose of sale or distribution for sale within the parameters of § 2252.

The appellant was convicted of violating 18 U.S.C. § 2252 with knowingly mailing obscene photographs and negatives for the purpose of sale and distribution to an undercover postal inspector in Chanhassen, Minnesota, and in New York City, New York, as well as to a photography laboratory in Philadelphia, Pennsylvania.[1] 18 U.S.C. § 2252 provides in pertinent part:

---

1. The jury was instructed that the crimes charged contained the following four elements:

 1. That on or about the date charged, the defendant knowingly mailed an item for the purpose of sale and distribution for sale.

 2. That the item mailed was visual or print medium depicting sexually explicit conduct—[as defined under 18 U.S.C. section 2253(2)].

 3. That the production of such a visual or print medium involved the use of a minor under the age of 16 engaging in sexually explicit conduct.

 4. That the visual or print medium was obscene.

(a) Any person who—

(1) knowingly transports or ships in interstate or foreign commerce or mails, for the purpose of sale or distribution for sale, any obscene visual or print medium, if—

(A) the producing of such visual or print medium involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual or print medium depicts such conduct; . . .

shall be punished as provided in subsection (b) of this section.

Initially, the appellant argued that he was denied a fair trial and moved to dismiss the indictment on grounds that the counts charged[2] were improperly venued in the Western District of Wisconsin and that a jury composed of persons residing in the Western District of Wisconsin would be unable to determine whether the materials allegedly mailed by the defendant violated the community standards of obscenity in the jurisdictions receiving the materials. The district court denied the defendant's motion and held that the case was properly venued in the Western District of Wisconsin pursuant to 18 U.S.C. § 3237(a) which provides in part:

Any offense involving the use of the mails, or transportation in interstate or foreign commerce, is a continuing offense and, except as otherwise expressly provided by an enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce or mail matter moves. (Emphasis added)

The defendant further requested that the jury be instructed to apply the standards of the receiving communities in determining whether the materials sent through the mail were obscene. The district court denied the defendant's request and instructed the jury that:

To determine whether an item is obscene, you must ask yourself three questions: (1) Would an average person applying contemporary community standards find that a photograph or negative, taken as a whole, appeals to the prurient interest; (2) Would the average person applying contemporary community standards find the photograph or negative depicts in a patently offensive way sexual conduct specifically defined by applicable law; and (3) Does the photograph or negative, taken as a whole, lack serious literary, artistic, political or scientific value? If the answer to all questions is yes, then the photograph or negative is obscene. To determine how 'the average person applying contemporary community standards' would consider the first two parts of the test, you're entitled to draw on your own knowledge of the views of the average person who resides in the State of Wisconsin.

In determining whether there is an appeal to the prurient interest, you may consider whether any of the photographs, including those developed from the negatives, would appeal to the prurient interest of pedophiliacs, persons essentially stimulated by sexual imagery of young people. An appeal to the prurient interest is an appeal to a morbid interest in sex as distinguished from a candid interest in sex

. . . .

The defendant has not been charged with employing, using, persuading, inducing, enticing, or coercing any minor to engage in any of the acts depicted in the material which he is alleged to have mailed; and the circumstances giving rise to the production of the material should not be considered by you, nor should they enter into your deliberations in any manner. . . . (Emphasis added)

The jury returned a verdict of guilty. The defendant was convicted on three counts of violating 18 U.S.C. § 2252 and

---

**2.** The defendant was also indicted for mailing obscene material to an individual in Green Bay, Wisconsin. That count was dismissed by the court at the conclusion of the evidence as the court ruled that none of the photographs mailed into the Green Bay area depicted minors under the age of 16.

was sentenced to a term of imprisonment of three years on each count with the sentences ordered to be served consecutively.

### Issues

Issue 1: Was it error for the district court to instruct the jury to apply the community standards of the sending jurisdiction rather than the receiving jurisdiction in determining if the materials are obscene?

Issue 2: Was the mailing of obscene negatives to a photography laboratory for developing under the facts of this case a mailing of obscene visual or print material for the purpose of sale or distribution for sale as required by 18 U.S.C. § 2252?

## 1. Community Standards of Obscenity.

In order to resolve whether it was appropriate for the district court to instruct the jury to apply the community standards of the sending jurisdiction in determining if the materials are obscene, we begin by reviewing the case law leading to the development of the "community standard" of obscenity.

 Initially, we point out that "obscenity is not within the area of constitutionally protected speech or press." *Roth v. United States*, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957); *New York v. Ferber*, ─── U.S. ───, ───, 102

S.Ct. 3348, 3352, 73 L.Ed.2d 1113 (1982). Thus "obscene" speech can be prohibited or otherwise regulated without violating the prohibitions of the first amendment to the United States Constitution. To this date, the United States Supreme Court has limited the definition of obscenity to those materials which "taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." [3] *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973). *Jenkins v. Georgia*, 418 U.S. 153, 160, 94 S.Ct. 2750, 2754, 41 L.Ed.2d 642 (1974), quoting *Miller v. California*, 413 U.S. 15, 27, 93 S.Ct. 2607, 2616, 37 L.Ed.2d 419 (1973); *Smith v. United States*, 431 U.S. 291, 301, 97 S.Ct. 1756, 1763, 52 L.Ed.2d 324 (1977). The question of obscenity *vel non*, once the constitutional threshold is satisfied, is one of fact.[4] See, *Miller*, 413 U.S. at 30, 93 S.Ct. at 2618; *Jenkins*, 418 U.S. at 159, 94 S.Ct. at 2754.

 The Supreme Court has expressly rejected, even when interpreting federal statutes, the view that the first and fourteenth amendments require uniform national standards of obscenity, describing such standards as "hypothetical and unascertainable." [5] *Hamling v. United States*, 418 U.S.

---

3. Patently offensive sexual conduct includes "representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated" and "representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." *Miller*, 413 U.S. at 25, 93 S.Ct. at 2615. If material falls within this category, "a trier of fact, applying the relevant community standards, would be permitted constitutionally, but not required, to find obscenity as a matter of fact." *United States v. Various Articles of Obscene Merchandise*, 433 F.Supp. 1132, 1136 n.7, *reversed on other grounds*, 562 F.2d 185 (2nd Cir. 1977), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978).

4. The basic guidelines for the trier of fact in both federal and state obscenity trials are:
(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest ...; (b) whether the work depicts or describes, in a patently of-

fensive way, sexual conduct specifically defined by the applicable state (federal) law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value. *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973) (citation omitted); *United States v. 12 200-Ft. Reels of Film*, 413 U.S. 123, 129-130, 93 S.Ct. 2665, 2669-2670, 37 L.Ed.2d 500 (1973); *Orito*, 413 U.S. 139 at 145, 93 S.Ct. 2674 at 2679, 37 L.Ed.2d 513; *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

5. However, instructing a jury to apply a national standard is nonreversible error where there is a probability that it did not materially affect the jury's deliberations. *Hamling*, 418 U.S. at 108, 94 S.Ct. at 2902. For views favoring application of a national community standard *see, Manual Enterprises v. Day*, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962) (Opinion of Harlan, J.); *United States v. Palladino*, 490 F.2d 499 (1st Cir. 1974).

87, 104, 94 S.Ct. 2887, 2900, 41 L.Ed.2d 590 (1974). It is clear that the community whose standards the jury must apply need not be precisely defined as the jury may be instructed to apply the standards of a "contemporary community" without further definition. *Jenkins*, 418 U.S. at 157, 94 S.Ct. at 2753. The community may also be defined by geographic terms such as the contemporary community standards of Mississippi or New York. *Id.*

In holding that contemporary community standards are to be applied in obscenity cases, the Supreme Court has emphasized that a juror's knowledge of the community in which he resides plays a vital role in the juror's reaching the judgment and findings that the average person in that community would reach in a given case. The Supreme Court stated that: "[a] juror is entitled to draw on his own knowledge of the views of the average person in the community or vicarage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a 'reasonable' person in other areas of law." *Hamling*, 418 U.S. at 104–105, 94 S.Ct. at 2900–2901. The Court's reliance on a juror's ability to draw upon his own knowledge of the standards of his community is exemplified by the Court's holding "that the prosecution need not as a matter of constitutional law produce 'expert witnesses' to testify as to the obscenity of the materials [because of] the ability of the juror to ascertain the sense of the 'average' person, applying contemporary community standards." *Id.* at 105, 94 S.Ct. at 2901.

The crime of which the defendant was convicted prohibited the mailing of *obscene* visual and printed material depicting minors engaging in sexually explicit conduct and thus consistent with the mandates of the United States Supreme Court the question of whether the material was obscene is to be determined by the application of "community standards." We point out, however, that under the recent decision of the United States Supreme Court in *New York v. Ferber*, —— U.S. ——, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) Congress need

not have required the material prohibited by § 2252 to be obscene in order to satisfy the first amendment protections of free speech. This is because in *Ferber* the Supreme Court decided that child pornography, like obscene materials, is excluded from the prohibitions of the first amendment.

*New York v. Ferber* involves a New York statute which, like § 2252, prohibited the sale or distribution of materials depicting children, under the age of 16, engaged in sexually explicit conduct but unlike § 2252, the New York statute did not require proof that the materials were obscene. The New York statute in question, Article 263, prohibited "any performance or part thereof which includes sexual conduct by a child less than sixteen years of age," § 263.10. Section 263.00, subd. 3 defines sexual conduct:

'Sexual conduct' means actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals.

The Court recognized that:

The federal government and forty-seven states have sought to combat the problem with statutes specifically directed at the production of child pornography. At least half of such statutes do not require that the materials produced be legally obscene. Thirty-five States and the United States Congress have also passed legislation prohibiting the distribution of such materials; twenty States prohibit the distribution of material depicting children engaged in sexual conduct without requiring that the material be legally obscene.

*Ferber*, —— U.S. at ——, 102 S.Ct. at 3351.

Prior to *Ferber*, it was presumed that child pornography like other sexually explicit material had to be determined obscene under the standards enunciated in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) before denying first amendment protection to the sexually explicit material. The *Miller* standard was

an accommodation between the state's interests in prohibiting the dissemination or exhibition of obscene materials and the freedom of speech interests protected by the first amendment. In *Ferber*, the Supreme Court examined the state's interest in prohibiting child pornography, and concluded that "the *Miller* standard is [not] a satisfactory solution to the child pornography problem." *Id.* at —— U.S. at ——, 102 S.Ct. at 3354. Instead, the Court said:

> When a definable class of material [child pornography] such as that covered by [the New York statute] bears so heavily and pervasively on the welfare of the children engaged in its production, we think the balance of competing interests is clearly struck and that it is permissible to consider these materials as without the protection of the first amendment.

> . . . . .

> [t]he test for child pornography is separate from the obscenity standard enunciated in *Miller*, but may be compared to it for the purpose of clarity. The *Miller* formulation is adjusted in the following respects: A trier of fact need not find that the material appeals to the prurient interest of the average person, it is not required that sexual conduct portrayed be done so in a patently offensive manner, and the material at issue need not be considered as a whole.

*Id.* at ——, 102 S.Ct. at 3355.

The distinction between the permissible scope of regulation under *Ferber* and *Miller* is demonstrated by contrasting § 2251 with § 2252. 18 U.S.C. § 2251 makes it a violation of the federal law "for anyone to use children under the age of 16 in the production of pornographic material [and] embraces all 'sexually explicit conduct' without imposing an obscenity test." *Id.* at n.15.

On the other hand, Congress saw fit to include "obscenity" as an element necessary for a violation of § 2252. Thus, the inclusion of children under the age of 16 in the production of any sexually explicit material will violate § 2251, while the sexually explicit material must be found obscene in order to prove a violation of the more restrictive § 2252.

*Ferber* makes it clear that Congress could have prohibited the mailing of material depicting minors engaged in sexually explicit conduct without including obscenity as an element of the crime, by simply prohibiting the mailing of "works that visually depict sexual conduct by children below a certain age." *Id.* at ——, 102 S.Ct. at 3355. However, since Congress did require proof of obscenity as an element of § 2252 and the appellant was convicted under the community standards set forth in *Miller*, we review the appellant's case under *Miller's* obscenity guidelines.

Having completed an overview of the case law establishing the "community standards" test of obscenity we now address the merits of the defendant's contention that the community standards of the sending jurisdiction were not the proper standards to apply in this case.

The appellant argues that the community standards of the receiving jurisdiction should have been applied in this case. He contends that jurors are only capable of applying the community standards of the community in which they reside. Thus, only jurors from the receiving jurisdiction could have applied the community standards of the receiving jurisdiction. The appellant concludes that he was deprived of his right of due process of law when the government chose, in his opinion, to improperly venue his case in the sending jurisdiction rather than in the receiving jurisdiction.

The appellant makes three arguments in support of the contention that the community standards of the receiving jurisdiction must be applied in his case. Initially, he offers a law review article, in which the authors argue that the community standards of the receiving jurisdiction must be applied in federal obscenity cases. The authors of the article assert that one objective of the federal obscenity statute is to assist local communities in their fight against the invasion of pornography. The authors theorize that applying the receiving jurisdic-

tion's community standards would coincide with this objective and would result in one predictable variable in obscenity cases, *the community standards of the receiving community.* Waples and White, *Choice of Community Standards in Federal Obscenity Proceedings: The Rule of the Constitution and the Common Law,* 64 Va.L.Rev., 399, 434 (April, 1978).

Secondly, the appellant argues that the government sought to prove that the mailed materials were obscene by showing that the mailed materials were of a type appealing to pedophiliacs. Therefore, the appellant concludes that since the government chose to premise its proof of obscenity upon the character of the intended recipient of the materials (the pedophiliacs), the standards of the community wherein the intended recipients reside must necessarily be applied.

As a final point of argument, the appellant contends that § 2252 "seeks to protect the ultimate viewer of the material." Thus, the community standards of the community where the protected viewer resides are the standards which should be applied.

Initially, it is important to recognize that 18 U.S.C. § 3237(a) authorizes federal obscenity cases to be venued in either the sending jurisdiction, receiving jurisdiction, or any jurisdiction through which the mailed obscene material moves.[6] If we were to accept the appellant's argument that the receiving jurisdiction's community standards must be applied in federal obscenity cases, we could conceivably place an undue burden on our court system and build in error. The receiving jurisdiction's community standards could only be applied by either holding a separate trial for each receiving jurisdiction or by having one trial but requiring the jury to apply a separate and distinct community standard for each receiving jurisdiction. For example, the appellant's case involved three receiving jurisdictions, New York, Minnesota, and Pennsylvania. If the appellant's argument were accepted, one of the ways in which the receiving jurisdiction's standards could be applied would be to require the government to undertake the time and unnecessary expense of prosecuting this defendant in separate trials in each of the three receiving jurisdictions. This choice would result in three separate trials in three separate jurisdictions with three potential appeals, thus tripling the burden on our already overburdened court system. The second option would be to have one trial but to require the jury to apply three separate community standards; one for each of the communities into which the appellant is charged with sending the obscene material. This would require evidence at trial of each of the three receiving jurisdiction's community standards, forcing the jury to apply an already complex obscenity statute to not one, but three communities—a defense attorney's dream of built-in error.[7] Defendants would be able to convincingly argue that their due process rights were violated by convictions handed down by juries placed in the difficult position of having to apply and differentiate between the separate and distinct community standards.

■ We interpret the defendant's argument that the community standard of the sending jurisdiction is not the proper standard to apply in determining if the mailed photographs were obscene as an attack on the validity of 18 U.S.C. § 3237(a) as it applies to forum selection in federal obscenity cases brought under 18 U.S.C. § 2251, *et*

---

**6.** While the appellant only argues that he should have been brought to trial in the receiving jurisdiction, § 3237(a) permits prosecution "in any district from, through, or into which such [obscene] commerce or mail matter moves." The government's ability to choose the place of venue under § 3237(a) is of course limited by *Fed.R.Crim.P.* 21(b) which allows the district court, upon motion by the defendant, to transfer the defendant's case to another district for the convenience of the parties and witnesses and in the interest of justice.

**7.** Were we to accept the appellant's argument and apply the receiving jurisdiction's community standards, then in the case of a multi-state distributor charged with mailing obscene material to twenty separate jurisdictions, we could conceivably have to require the jury to apply twenty *separate* receiving jurisdiction's community standards in one trial.

*seq.*[8] He contends that § 2252 seeks to protect the ultimate viewer of the material and therefore necessitates application of community standards where the viewer resides.

Our examination of the appellant's attack on 18 U.S.C. § 3237(a) necessarily begins with an examination of 18 U.S.C. § 2251, *et seq.*, the act under which the appellant was convicted, entitled "The Protection of Children Against Sexual Exploitation Act of 1977." The title of § 2252, "Certain activities relating to material involving the sexual exploitation of minors" makes clear Congress' broad concern that:

> [T]he [Federal] Government has a legitimate interest in protecting the public commercial environment by preventing such material from entering the stream of commerce. . . . 'It is sufficient to reiterate the well-settled principle that Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral or economic nature.' *United States v. Orito*, 413 U.S. 139, 143–44, 93 S.Ct. 2674, 2677–2678, 37 L.Ed.2d 513 (citation omitted).

It is clear that the United States government's interest in protecting minors from sexual exploitation in the highly organized, multi-million dollar industry of child pornography and child prostitution, which operates on a nationwide scale, reaches beyond merely controlling the production of the obscene materials and includes each and every aspect of the illicit pornographic scheme. The distribution and sale of these materials is nothing more than the fruition of the process of the children's exploitation. The Supreme Court recently noted that:

> [t]he distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children in at least two ways.

First, the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. Second, the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled. Indeed, there is no serious contention that the legislature was unjustified in believing that it is difficult, if not impossible, to halt the exploitation of children by pursuing only those who produce the photographs and movies. While the production of pornographic materials is a low-profile, clandestine industry, the need to market the resulting products requires a visible apparatus of distribution. The most expeditious if not the only practical method of law enforcement may be to dry up the market of this material by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product.

It is evident beyond the need for elaboration that a state's interest in 'safeguarding the physical and psychological well being of a minor' is 'compelling.' *Globe Newspapers v. Superior Court*, —— U.S. ——, —— [102 S.Ct. 2613, 2621, 72 L.Ed.2d 248] (1982). 'A democratic society rests, for its continuance, upon the healthy well-rounded growth of young people into full maturity as citizens.' *Prince v. Massachusetts*, 321 U.S. 158, 168, 64 S.Ct. 438, 443, 88 L.Ed. 645 (1944).

*Ferber*, —— U.S. at —— – ——, 102 S.Ct. at 3353–3354. This necessitates the rejection of the appellant's ridiculous contention that § 2252 of the Act is merely geared towards the protection of the viewers of the material, a position which defies both law and common sense.

■ We also recognize the interest and the concern of the citizens of the sending jurisdiction that it not become the platform

---

**8.** The possibility that the appellant could have been tried in several different jurisdictions under differing community standards does not give rise to an unconstitutional lack of notice of the applicable community standards. *See*

*Hamling*, 418 U.S. at 107, 94 S.Ct. at 2902; *Roth*, 354 U.S. at 491–92, 77 S.Ct. at 1312–1313, 1 L.Ed.2d 1498; *United States v. West Coast News Company*, 30 F.R.D. 13, 21 (W.D. Mich.1962).

**1096**

and a staging center for the sale and/or the distribution for sale of obscene materials. The use of local community standards reinforces the right of citizens to keep their respective communities free of obscene materials by allowing the residents of a community to decide for themselves what will or will not be considered obscene in their local community. The Supreme Court has stated that it is neither realistic nor constitutionally sound to read the first amendment as requiring the people of Maine or Mississippi to accept the type of conduct found tolerable in San Francisco, Las Vegas, or New York City. *Miller*, 413 U.S. at 32, 93 S.Ct. at 2619. In the present state of the law, citizens of Wisconsin cannot be required to accede to the community standards of New York, Minnesota or Pennsylvania merely because Wisconsin is the sending jurisdiction and the other communities are the receiving jurisdiction.[9]

■ Congress' decision to allow cases such as the one at bar to be venued in either the sending or receiving jurisdiction demonstrates that § 2252 was intended to protect the inhabitants of the sending jurisdiction from being the situs of the production and distribution of pornographic materials to the same extent that it protects the receiving community from the receipt of those materials. The sending jurisdiction's interest in assuring that it is not the point of origination of obscene materials, justifies our conclusion that venuing the action in the sending jurisdiction did not violate the defendant's right to due process. Further, the venuing of the action in the sending jurisdiction forwards the interest in judicial economy by limiting the number of trials and in reality affords the defendant consist-

ent treatment under the law because all of the visual material will not be judged separately under the potentially inconsistent standards of each of the receiving jurisdictions.

We hold that this case was properly venued in Wisconsin and that the district court properly instructed the jury to apply the community standards of the average person residing in the State of Wisconsin.

2. *Mailing for Purpose of Sale or Distribution.*

■ The appellant challenges his conviction on Count IV, arguing that mailing negatives to a photography laboratory in Philadelphia, Pennsylvania, for the purpose of processing the negatives into photographs cannot violate § 2252 as that statute only prohibits mailing obscene materials "for the purpose of sale or distribution for sale." The appellant's argument rests solely on the wording of the statute.

The appellant argues that he did not sell the negatives to the photography laboratory, therefore he does not come within the purview of the statute.[10] 18 U.S.C. § 2252 does not require the prosecution to prove that the appellant mailed obscene material with the intent to make a sale to the photography laboratory in Philadelphia. Rather, the statute uses the broader term "purpose", which encompasses and prohibits any future plan or scheme of the commercial pornographer to sell or distribute the obscene prints for sale.

The appellant further argues that Congress did not intend that § 2252 prohibit one from sending obscene negatives to a photography laboratory for processing into

**9.** Appellant contends that because the government chose to prove that the mailed materials were designed to appeal to the prurient interests of the intended recipients (pedophiliacs), the community standards of the receiving state should be the controlling standard. (It is not contended that there are not pedophiliacs in the sending jurisdiction and that the jury would not be able to determine the prurient appeal of the materials to this group.) However, whether the materials appeal to the prurient interest of the general population or of a select group

would not make a difference in defining the relevant community whose standards are to be applied. The core question is does the jurisdiction, which seeks to apply its contemporary community standards in regulating the appellant's activities within the jurisdiction, have a legitimate interest in justifying the asserted power it seeks to exercise.

**10.** The appellant's brief does not dispute that § 2253(4) defines "visual and print medium" as including negatives.

prints. However, our review of the legislative history of the pornography statutes shows that Congress was concerned with the overall chain of commercial pornography,[11] from the taking of the obscene pictures, the processing of the prints,[12] to the ultimate sale of the obscene prints and that Congress clearly intended that § 2251 *et seq.* eradicate the entire commercial chain involved in the production, distribution and sale of child pornography.[13]

It is obvious, from the quotation below, that the appellant was a part of a commercial chain of child pornography at the time the appellant mailed his negatives to Philadelphia and requested a special price due to his volume:

> I am a dealer using 800 to 1500 prints a month, 3½ by 5, silk tone-borderless. I order 10 prints each neg. at a time, usually 10–20–50 negs per order. Now if you can drop your prices, I will give you some business—J. Langford, 201 North Street, Madison, Wisconsin.

In light of the fact that the appellant contemplated ordering 800 to 1500 obscene prints per month, it strains reason and credibility to believe that the appellant had any intent other than the purpose of sale or distribution for sale. Certainly this large volume of obscene material was not ordered for his personal use.

We hold it is clear that Congress intended to wipe out the entire spectrum of child pornography and in doing so saw fit to broaden the scope of the legislation through the use of the term "purpose." A term intended to include each and every aspect of the business enterprise of peddling filth. Congress intended the mailing of obscene negatives, in this case the second phase of a four-phase commercial pornography scheme prior to the ultimate sale, to be encompassed within the parameters of the statutory prohibition contained in § 2252.

The decision of the district court is Affirmed.

HARLINGTON WOOD, Jr., Circuit Judge, concurring.

Having no doubts about the option of the government to prosecute in Wisconsin where the mailings originated, rather than in Minnesota, New York and Pennsylvania where received, and having no doubts about the mailing of film to a laboratory for processing and the return of negatives to the sender as qualifying under the statute, I gladly join the majority in affirming this conviction for the defendant's use of the mails to further his miserable business.

PELL, Circuit Judge, concurring.

I join in Circuit Judge Wood's concurrence.

---

**11.** "Finally, as noted earlier, it appears that because of the vast potential profits in child pornography, these sordid enterprises are growing at a very rapid rate." *1978 U.S.Code Cong. & Ad.News,* at 44.

'Child pornography and child prostitution have become highly organized, multimillion dollar industries that operate on a nationwide scale.' S.Rep.No.95 438, p. 5 (1978). One researcher has documented the existence of over 260 different magazines which depict children engaging in sexually explicit conduct. *Ibid.* 'Such magazines depict children, some as young as three to five years of age . . . The activities featured range from lewd poses to intercourse, fellatio, cunnilingus, masturbation, rape, incest and sado-masochism.' *Id.* at 6. In Los Angeles alone, police reported that 30,000 children have been sexually exploited. Sexual Exploitation of Children, Hearings before the Subcommittee on Select Education of the House Comm. on Ed. and Labor, 95th Cong., 1st Sess., 41–42 (1977).
*Ferber,* —— U.S. at ——, n.1, 102 S.Ct. at 3351 n.1.

**12.** "It should also be remembered that in reproducing these materials thousands of copies can be made from a single negative. As a result, the costs of producing child pornography are minimal but the profits are often enormous." *1978 U.S.Code Cong. & Ad.News,* at 44.

**13.** "Since the production, distribution and sale of child pornography is often a clandestine operation, it is extremely difficult to determine its full extent. At present, however, a wide variety of child pornography is available in most areas of the country. Moreover, because of the vast potential profits involved, it would appear that this sordid enterprise is growing at a rapid rate."
*Id.* at 43.